David ATLAS, Plaintiff, Appellant,

v.

EASTERN AIR LINES, INCORPORATED et al., Defendants, Appellees.

No. 6014.

United States Court of Appeals
First Circuit.

Dec. 11, 1962.

Joseph Zallen, Boston, Mass. (Martin W. Cohen, Boston, Mass., on the brief), for appellant.

Robert B. Russell, Westwood, Mass. (Russell, Chittick & Pfund, Boston, Mass., on the brief), for appellees.

Before WOODBURY, Chief Judge, and HARTIGAN and ALDRICH, Circuit Judges.

HARTIGAN, Circuit Judge.

This is an appeal from a judgment of the United States District Court for the District of Massachusetts entered January 8, 1962 granting defendants' motion for summary judgment and dismissing the complaint, and from the denial of plaintiff's motion for rehearing entered April 9, 1962.

Plaintiff-appellant, a resident of Massachusetts, brought an action against defendants-appellees, Delaware corporations, claiming damages for infringement of Atlas [plaintiff's] patent No. 2,656,531 and reissue patent No. Re 24,084. The original patent and the reissue relate to a "Device to Permit Radar Contour Mapping of Rain Intensity." This device—designed for use in airplanes—involves a method of directing radar transmission towards a storm area and estimating the degree of magnitude of storm intensities by the strength of echo signals returned by the water particles within the storm cloud. A pictorial map of the relative intensities of water particles within the storm area is furnished the pilot of a plane in the form of contours on the PPI scope of a radar set, thus enabling the pilot to direct his flight course through the less dense areas of the storm—avoiding the turbulent or dangerous areas.

Plaintiff apparently developed the device sometime in 1947 while employed as a meteorologist by the Air Material Command at Wilmington, Ohio. He filed his original application for a patent on September 12, 1950. The patent was granted on October 20, 1953 and reissued on November 1, 1955.

In the court below, following extensive pre-trial discovery, defendants moved for summary judgment on the ground that the subject patents were invalid because the patented device had been fully described to the public in printed publications as early as three years in advance of the date that plaintiff applied for his patent. Alternatively, defendants contended that the subject device had been in "public use" more than one year prior to plaintiff's application and consequently that the action was barred under 35 U.S.C. § 102(b) which provides in pertinent part:

"A person shall be entitled to a patent unless * * * (b) the invention was * * * in public use or on sale in this country, more than one year prior to the date of the application for patent in the United States * * *."

The district court, after reviewing the various asserted instances of prior publications, held that none could be deemed so comprehensive or detailed so as to constitute a publication sufficient to render the subsequent grant of the patent invalid. Wisconsin Alumni Research Foundation v. George A. Breon & Co., 85 F.2d 166 (8th Cir. 1936).

However, the district court held that there had in fact been a public use of the patented device more than one year prior to plaintiff's filing his patent application and, on this basis, granted defendants' motion for summary judgment.

The asserted instance of public use involved a flight by American Airlines on August 12, 1949,[1] on which a device comparable to the one subsequently patented by plaintiff was utilized and demonstrated. The record indicates that sometime after plaintiff had developed his device, American Airlines, under a contract with the Navy, had itself devised an instrument designed to permit radar contour mapping of storm areas. As noted by the district court, American Airlines' instrument differed technically from the device of plaintiff in that it utilized but two channels as opposed to the four which were found in plaintiff's instrument. However, this difference was not material since, as plaintiff admitted in his deposition, the two-channel variation "was such an obvious thing to do that it was hardly worth while." However, it is clear that both the two and four channel devices were designed to serve the

---

1. As noted above, plaintiff did not file for his patent until September 12, 1950.

identical function—that is to provide the pilot of an aircraft with a means of analyzing the internal discriminations within an area of turbulence as distinguished from merely being given a view of the general exterior shape of the storm—the apparent state of the art prior to the subject inventions.

The facts surrounding the asserted and critical instance of public use were described by the district court as follows:

> "After plaintiff had developed his device, the airline [American] made a so-called 'simplified version' of the device which it installed on a test plane along with other radar equipment which it was testing * * *. On August 12, 1949 American Airlines conducted a flight of this test plane for the purpose of demonstrating their latest developments in flight equipment to eight invited representatives of the press. Their version of the Atlas device was installed in the plane; it was shown in operation to the newsmen present. They were given an explanation of its purpose and usefulness and shown photographs of radar pictures of storm contours which would be produced on a radar screen by the use of the device. No actual storm was encountered during the demonstration flight, so that the newsmen did not see the actual pictures produced in the presence of a storm."

Plaintiff argues that the flight of August 12, 1949 should not be regarded as a "public use"—invalidating plaintiff's patent—because the flight was of an "experimental" nature and consequently an exception to the ordinary rule that public use one year before application invalidates a patent. The validity of plaintiff's contention presents the major issue on this appeal.

■ It is well settled that the policy consideration behind the "public use" rule is to stimulate a seasonable disclosure of new inventions within the framework of the patent laws. In Pennock v. Dialogue, 27 U.S. (2 Pet) 1, 7 L.Ed. 327 (1829), the Supreme Court stated that the public use provisions were aimed at preventing an inventor from holding back the secrets of his invention while concurrently exploiting it, and thereafter exchanging his knowledge for a legal monopoly when confronted with the possibility of competition. This policy was reiterated by the Court in Andrews v. Hovey, 123 U.S. 267, 274, 8 S.Ct. 101, 31 L.Ed. 160 (1887), aff'd on rehearing, 124 U.S. 694, 8 S.Ct. 676, 31 L.Ed. 557 (1888), where it was stated: "Its object was to require the inventor to see to it that he filed his application within [the statutory period] from the completion of his invention, so as to cut off all questions of the defeat of his patent by a use or sale of it by others more than [the statutory period] prior to his application * * *."

■ An exception to the general principle of seasonable disclosure articulated in the "public use" provisions occurs in those situations where the use in question is of an experimental nature. Electric Storage Battery Co. v. Shimadzu, 307 U.S. 5, 59 S.Ct. 675, 83 L.Ed. 1071 (1939). This exception proceeds on the premise that an inventor, once he has conceived his invention, should be accorded sufficient time to perfect that invention and the time which elapses during this interim period should not be computed as part of the "one year" requirements of the "public use" statute. During the experimental period, the inventor may freely use his invention "for the purpose of testing the machine," Smith and Griggs Mfg. Co. v. Sprague, 123 U.S. 249, 256, 8 S.Ct. 122, 125, 31 L.Ed. 141 (1887) or "in order to bring the invention to perfection" Elizabeth v. Pavement Co., 97 U.S. 126, 134, 24 L.Ed. 1000 (1877) without causing the statutory period relating to public use to run.

■■ Neither the fact that the invention in question was used in public over a protracted period of time, Elizabeth v. Pavement Co., supra, nor the fact

that the owner may have derived some financial profit during the time that the device was so used, Smith and Griggs Mfg. Co. v. Sprague, supra, will negate the contention that the use was "experimental" where the facts indicate that the subject use was essentially an integral part of a bona fide program of experimentation. In short, to fall within the exception the use must be one "which may be properly characterized as substantially for purposes of experiment," Smith and Griggs Mfg. Co. v. Sprague, supra, 123 U.S. at 256, 8 S.Ct. at 125 regardless of its incidental features. And "[a]s a general principle, any non-secret use of the completed and operative invention or discovery in its natural and intended way is a public use within the meaning of the statute." Bourne v. Jones, 114 F.Supp. 413, 419 (D.C.S.D.Fl. 1952), aff'd, 207 F.2d 173 (5th Cir. 1953), cert. den., 346 U.S. 897, 74 S.Ct. 220, 98 L.Ed. 398.

■■ Where the validity of a patent is put in issue on the basis of a "public use" outside the statutory limit, the party asserting such use must offer evidence that "shall be clear, satisfactory, and beyond a reasonable doubt." The Barbed Wire Patent, 143 U.S. 275, 284, 12 S.Ct. 443, 447, 36 L.Ed. 154 (1892). However, once a prima facie demonstration of the claimed use has been made, the inventor carries the burden of showing that the use was not of a functionally operative device, or was substantially used for experimentation or testing purposes and this must be demonstrated by strong and convincing proof. National Biscuit Co. v. Crown Baking Co., 105 F.2d 422 (1st Cir. 1939).

■ As noted above, the instant case comes to us with the trial judge having entered summary judgment against the inventor on the ground that the American Airlines' flight of August 12, 1949 constituted an instance of "public use" which was outside the alleviating exception of "experimental use." The case in this posture gives rise to the familiar principle that a reviewing court must view the evidence in the light most favorable to the party against whom the motion has been granted, according that party the full benefits of all favorable inferences that may be drawn from the evidence in determining whether there exists a genuine issue of material fact. Manganaro v. DeLaval Separator Co., decided November 1, 1962, 309 F.2d 389 (1st Cir.), and cases cited therein.

In support of its motion for summary judgment the defendants introduced two affidavits, one of Robert W. Ayer, assistant director of operational development for American at the time of the August 12, 1949 flight, and the other of Frank W. White, then assistant director of air navigation traffic control at American. Both Ayer and White had left the employ of American at the time they submitted the instant affidavits. Both had testified previously by depositions taken by the defendants.

In his affidavit, Ayer stated that during the years 1947–1949, he had been in supervisory charge of a group of engineers at American Airlines, one of whose specific objectives was to develop radar for commercial airline use. He indicated that his group performed most of the work in this field under a development contract with the United States Navy. Ayer stated that it was American's policy to publicize widely any information concerning airborne radar developments as soon as they were proved "operational." One of the means which was used to effectuate this publicity was public demonstration to the press. Pursuant to this policy Ayer testified that in August 1949, American invited eight members of the New England area press to a public demonstration of the declassified airborne radar developments and a demonstration flight took place on August 12. Ayer's affidavit recited that "All of the radar equipment which we had developed at American Airlines * * * was on board the aircraft and was functioning at that time and during that flight. More specifically as it bears on the subject matter of the Atlas patents * * * we had on board and demonstrated to the press the so-called weather radar contour

mapping device which we had previously built and proved operational."

Ayer was navigator of the plane which flew this flight. Ayer's affidavit incorporated various exhibits attached thereto consisting of newspaper stories—some of which were written by reporters who were on the flight.

White's affidavit also confirmed the fact that it was American's policy to widely publicize radar developments once they became operational and that incident to this policy, American utilized the August 12th flight to demonstrate the radar contour mapping device which had been "previously built and proved operational." White's affidavit concluded with the statement that "The * * * device which we demonstrated to the press on * * * August 12, 1949 was in working order and entirely operational."

The exhibits attached to and incorporated in the Ayer affidavit consisted of newspaper articles written by air-news specialists. These fell into two categories. The first consisted of dispatches written during 1947 which indicated the extensive research activities relating to airborne radar in which American had already engaged at that time. One of these articles related the writer's participation in an airborne radar demonstration with the engineering staff of American Airlines in which the equipment was utilized for a variety of purposes. One of the uses for which the equipment was being tested during the 1947 flight was "weather and traffic interpretation which gives the pilot an actual measuring rod of atmospheric conditions" so that the pilot "can see the dimensions and nature of a thunderstorm or an icing area. * * * In short, a major use of air borne radar is to provide the airman with atmospheric pattern flying."

The second series of articles were written by newsmen who participated in the demonstration flight of August 12. These articles confirmed the flight. In speaking of its purpose they stated typically "the improved radar can identify and analyze storms ahead, tell which part of the air will be turbulent and which part contains hailstones." The articles went on to point out that the equipment had been the subject of extensive testing,[2] both in the United States and in eastern Canada, and that the demonstration flight was the culmination of America's research program —evidenced by the fact that the test plane used on the August 12 flight was to be reconverted to a commercial airliner immediately following the demonstration flight.

In one of the exhibits, Ayer is quoted as stating after the flight that "airborne radar is now probably as fully developed as any other aircraft instrument was at the time of its adoption."

Finally, both Ayer and White testified in their affidavits that the device demonstrated to the press on the August 12 flight was the only version of the device which American Airlines ever manufactured.

Plaintiff submitted an affidavit in opposition to defendants' motion for summary judgment which—outside of characterizing the flight as "private and experimental"—did nothing to rebut the "public use" nature of the August 12 flight. And, it was in this posture that the case was submitted to the district judge on motion for summary judgment.

■ We do not believe that under the facts of the record the plaintiff's conclusionary description of the flight as "experimental" was sufficient to raise a genuine issue of material fact so as to forestall summary judgment. See, Minnesota Mining & Mfg. Co. v. United

---

2. White testified in his deposition as to the extent of the research activities leading up to the flight of August 12, 1949: "Do you know whether or not the contour circuitry * * * [of American] * * * produced contours? A. Yes, I know that it did. Q. How were you sure that it did? A. We used it in several hundred hours of flight operation in probing thunder storms to determine the results that could be obtained from using contour circuitry."

States Rubber Co., 279 F.2d 409 (4th Cir. 1960); Runkle v. Nong Kimny, 105 U.S.App.D.C. 285, 266 F.2d 689 (D.C. Cir.1959); Meyers v. District of Columbia, 17 F.R.D. 216 (D.C.D.C.1955). Rather we believe that the record clearly indicates that the flight of August 12 showed the American Airlines' device to be a functionally successful embodiment of the instrument which American Airlines had set out to produce at least as early as 1947 and which, after an extensive program of experimentation and research, the company was able to successfully demonstrate to the public at large. A device so successful that it was the only type of device which the company ever produced.

■ The thrust of plaintiff's argument in this court is that the type of device represented by the American Airlines instrument had not been fully perfected and was still the subject of further refinements. However, the rule is that an invention is deemed functional for public use purposes when it can perform the general function for which it has been developed, even though the device might later be refined. Hall v. MacNeale, 107 U.S. 90, 2 S.Ct. 73, 27 L.Ed. 367 (1882); National Biscuit Co. v. Crown Baking Co., 105 F.2d 422 (1st Cir. 1939); Monroe v. Bresee, 239 F. 727 (1917).

■ We fully recognize that mere reduction to practice, see Corona Cord Tire Co. v. Dovan Chemical Corp., 276 U.S. 358, 48 S.Ct. 380, 72 L.Ed. 610 (1928), is not the test and that in the appropriate case "experiments may continue in an attempt to further perfect the device beyond the requirements of a reduction to practice." General Motors Corp. v. Bendix Aviation Corp., 123 F. Supp. 506, 520 (D.C.N.D.Ind.1954).

However, in the instant case, so far as experimental use is concerned, we fully agree with the district court that: "There was no question involved of seeing whether the device worked or how it could be improved. Such experimentation as was to be made had been completed. The sole purpose of the flight was to show to the press and through them to the general public new developments in radar equipment which had been proved operational."

■ Plaintiff also urges here that the district court erred in granting the motion for summary judgment because the record indicated that the credibility of the affiants, Ayer and White, was in serious question. Plaintiff bases this contention on the similarity in language between their two affidavits and implies a sinister collusion. Defendants' counsel candidly admitted at oral argument that the language was similar because he prepared both affidavits based on the independent recollection of the affiants. Be that as it may, counsel for plaintiff did not seek to raise this issue below nor did he attempt to cross-examine the affiants in this regard at the taking of depositions. Consequently he cannot be heard now. Thomas v. Mutual Benefit Health & Accident Ass'n, 220 F.2d 17 (2nd Cir. 1955); Topp-Cola Company v. Coca-Cola Company, 185 F.Supp. 700 (D.C.S.D.N.Y.1960).

■ Finally, we cannot say that the district judge's refusal to entertain a petition for rehearing constituted an abuse of discretion in view of the material contained in plaintiff's supplementary affidavits. George P. Converse & Co. v. Polaroid Corporation, 242 F.2d 116 (1st Cir. 1957).

Judgment will be entered affirming the judgment of the district court.