**James Nelson HINDE and Hinde Engineering Company, Plaintiffs,**

v.

**HOT SULPHUR SPRINGS, COLORADO, a Municipal corporation, Defendant.**

**Civ. A. No. C–1936.**

United States District Court,
D. Colorado.

Sept. 28, 1972.

William Griffith Edwards, McGrew & Edwards, Denver, Colo., Fred S. Lockwood, Lockwood, Dewey, Zickert & Alex, Chicago, Ill., for plaintiffs.

Herbert A. Shatz, Denver, Colo., Jon Mulford, Granby, Colo., George A. Smith, Jr., Smith, Harding, Earley & Follmer, Philadelphia, Pa., for defendant.

## MEMORANDUM OPINION

BRATTON, District Judge.

The factual background out of which the present infringement action arose began in 1958 when plaintiff James Hinde began experimenting with concepts of water aeration to prevent winter fish kill as a favor to a friend. He first punched tiny holes in copper tubing and, with the aid of a small air compressor, pumped air through the rows of tubing he submerged in his friend's small trout pond so that tiny bubbles of oxygen were placed in the water and the fish stopped dying. Many of the holes in the tubing, however, clogged rapidly, and the bubbles produced through the open holes were very large.

After this incident he began to investigate materials other than copper tubing which might release air into water in a more controlled manner. He experimented both with new materials, including garden hose, and with various methods of perforation.

In that same year he had an opportunity to try out perforated polyethylene tubing at the Kenosha Trout Club in Colorado. The tubing he sent to be installed was perforated every five feet with little round needle holes, and, once the club members got it submerged and weighted down it was effective not only in preventing fish kill but also in melting large strips of ice. Mr. Hinde never saw this installation, but its success as reported to him encouraged him to form his own company.

In the summer of 1959 he also sent tubing to the Montague Fish Hatchery in Massachusetts. It was installed in one of the ponds for which he had made a lay-out, but he immediately began getting complaints about its effectiveness. This tubing had round valves punched with a needle and was weighted with taped-on lead. He was now discovering that clogging was a major problem, so he set about finding a solution. He developed a chisel-shaped needle that would punch slotted self-closing valves and sent the tubing so punched to the hatchery at no charge. Because of the mineral content, this tubing also failed, but the time consumed in taping the lead on it preparatory to its shipment convinced him that he should pursue the

idea of having the tubing manufactured in such a way that the lead along its underside would be encapsulated and become a part of the tubing.

In January of 1960, he installed at Bauduin Yacht Club aeration tubing to melt ice around the pier. He taped lead wire on this tubing so that it would be weighty enough to sink and used a bigger needle to punch holes in the tubing and spaced the holes at two feet intervals. The tubing criss-crossed around the pilings. After discovering that slit holes produced small bubbles and did not clog as rapidly as round holes, he subsequently sent the Bauduin people a minute knife blade with which to go over the holes and convert them into slits.

In the summer of 1960 he began work on a die that would put self-closing slit valves in the tubing without widening it as much as his chisel-shaped needle had.

By November of 1960, the company manufacturing the tubing for him was able to produce a tubing with an encapsulated lead keel. About this time, he had perfected a die to make slit valves, but he had to revise it in order to use it on tubing with a lead keel.

It was after this that he began to consider the tubing's potential use for the treatment of domestic and industrial waste. Thinking that it was an economical means of putting oxygen into water and achieved good control without much turbulence, he concluded that he had developed something that he could sell for sewage treatment.

In the early summer of 1961 he sold and shipped tubing to Butterfield Estates, Illinois, to be installed to treat the waste from the housing development. The basis upon which he got this job was to offer to put it in and, if it worked, to be paid for it. In November another such installation was made at Tinley Heights, Illinois. In both installations, the tubing had slit valves and was weighted with an encapsulated lead keel.

The lagoon in which he made his installation at Tinley Heights was a rectangle with the inlet into it at its center. He arranged lengths of tubing on the bottom of the pond at right angles to the flow of the sewage, spacing them close together near the inlet and spreading them out as the end of the pond was approached. Above the inlet, where the sewage was not actually flowing, the tubing was spaced farther apart. Air was pumped into the tubes and, as it was released from the valves in the tubing in bubble form, it rose upward, forming curtains of aerated liquid which had downward recirculation at the surface of the liquid. In between such curtains were formed treatment cells in which the liquid underwent recirculation and in which controlled aerobic treatment was carried out. The Tinley installation operated successfully for several years until sewer lines were installed. The Butterfield installation was almost identical, and it, too, operated successfully.

A similar installation was made for the United States Industrial Chemicals Company at Tuscola, Illinois in the summer of 1961, and, to date, over 300 such installations have been made in various parts of the country.

Mr. Hinde began employing the trade-mark "Air-Aqua" in connection with his systems and, by making two successive patent applications, tried to effectively protect his inventions.

On November 13, 1961, he applied for a patent on his method of distributing fluids into bodies of liquid and the apparatus therefor. This application matured into United States Patent No. 3,-293,861 (hereinafter referred to as patent '861). The '861 patent in brief covers the tubing described above, i. e., flexible weighted tubing having a plurality of outlet valves in the upper path thereof, such valves in the form of self-closing slits, and the treatment of bodies of liquid, particularly the melting of ice, by submerging such tubing and introducing air into it so that upward laminar flow is produced by the production of tiny air bubbles, the majority of which do not

exceed one-eighth inch, from the discharge of the air through the slit-valves.

On December 26, 1962, Mr. Hinde filed an application for a patent on a method and means for treating bodies of water. This application matured into United States Patent No. 3,234,123 (hereinafter referred to as the '123 patent). The patent lists the complete treatment of domestic and/or industrial sewage as one of the purposes of the method.

The '123 patent sets out that it is a continuation-in-part of the prior co-pending application (patent '861) and that the disclosure of the prior co-pending application is incorporated by reference into the '123 patent.

Briefly, the patent claims as a method of treatment the release of oxygen-containing gas into the liquid from a plurality of submerged flexible conduits having a narrow row of self-closing slit valves in the upper portions of the conduits for the full length of each conduit. The conduits are arranged in parallel rows sufficiently close together so that gas bubbles, the majority of which do not exceed one-eighth inch, produce upward laminar flow, and form curtains of aerated liquid above each conduit which rise to the top and form downward recirculation of the liquid between each curtain, creating in the body of liquid a series of hydraulically defined cells. Claim 8 of the '123 patent claims the method described as applicable to domestic sewage and industrial waste.

Claim 21 of the patent covers a method of treating sewage or industrial waste in an elongated lagoon of uniform depth with an influent at one end and an effluent at the opposite end. Claim 21 includes the placement or arrangement and use of a plurality of lengths of flexible tubing with self-closing slit valves in the upper portion for the full length of each conduit and provides for a compressed air header from which air is supplied to the conduits and released therefrom through the slit valves in bubble form. The slit valves are so sized and spaced as to produce a majority of bubbles of one-eighth inch that rise close together, forming upward laminar flow above each conduit.

Both patents will be covered in greater and more accurate detail in the following discussion.

Mr. Hinde and his licensee, Hinde Engineering Company, filed the present suit when it was discovered that the town of Hot Sulphur Springs, Colorado, had installed a system for treating liquid sewage. The plaintiffs believe that the installation infringes upon Claims 8 and 21 of the '123 patent.

The plaintiffs had submitted, through their Denver agent, Control Sales, Incorporated, a design for this installation to the defendant's consulting engineers, Parker and Associates. They claim that their design was followed by defendant's engineers in preparation of their plans and specifications for the installation and was followed in constructing the installation. They also charge that the installation opeates as it was designed by them to operate. The principal change in the installation is claimed to be the substitution of aeration tubing furnished by Schramm, Incorporated, for plaintiffs' tubing. Plaintiffs charge that defendant's infringement was deliberate, willful and wanton, with faithful copying of the patent process and installation and ask for treble damages and attorney fees under 35 U.S.C.A. §§ 284, 285.

The town of Hot Sulphur Springs has been defended in this action by Case/Cotter, Inc., of Denver, Colorado, the company that substituted the Schramm tubing, and by Schramm, Inc., of West Chester, Pennsylvania. In this connection, plaintiffs assert that these companies have placed themselves in privity with the named defendant in respect to the present action and should be bound by the court's decision.

The defendant has denied infringement and has asserted the defenses of invalidity of the '123 patent and fraud on the Patent Office.

■ First to be considered is the validity of the patent in suit. See McCullough Tool Company v. Well Surveys, Inc., 343 F.2d 381 (10th Cir. 1965). Challenges to its validity have been raised under 35 U.S.C.A. §§ 112, 102, and 103.

Under paragraph two of 35 U.S.C.A. § 112, it is required that the specifications conclude with one or more claims particularly pointing out and distinctly claiming the subject matter regarded as his invention by the applicant. Defendant asserts that Claims 8 and 21 are so indefinite in certain particulars that they do not guard against unreasonable advantages to the patentee and disadvantage others because of uncertainty as to their rights.

First challenged is the use of the term "narrow row" with reference to the rows of self-closing slit valves. Defendant claims the term is unexplained in the patent specification and was added by amendment to distinguish Hinde's claims from the Examiner's combination of references, including the Coppock patent. That patent allows an array of slits at least two and one-half inches wide. Defendant claims that the term "narrow" does not define how much narrower than the Coppock array one can go before infringing upon the Hinde patent and, hence, the claims in suit are inexact and unclear at the point of novelty.

It is also asserted that Claims 8 and 21 are indefinite because they cover a situation where laminar flow is not produced, i. e., the claims refer not only to bubbles of one-eighth of an inch or less but also to bubbles of more than one-eighth inch, the latter causing turbulent or nonlaminar flow.

Also challenged as indefinite is the term "curtain of aerated liquid" which, it is charged, renders Claim 8 indefinite. The thrust of this argument is that there is no explanation of how to obtain a "curtain" because of inadequacies in the description of the bubble size needed to achieve a curtain.

It is also contended that Claims 8 and 21 are indefinite because the spacing between the slit valves on the tubing ranges from one-eighth inch to eight feet in the '123 specification. On the other hand, Claims 8 and 21 require the slit valves to be "spaced sufficiently close together" to produce upward laminar flow. Hence, it is charged the only way a party trying to avoid infringement can determine from the claim language or from the specifications of the '123 patent what spacing will avoid the upward laminar flow is to undertake considerable experimentation.

Finally, it is charged that the patent in suit fails to comply with the first paragraph of 35 U.S.C.A. § 112 in that the indefiniteness of the claims cannot be cured by reference to the specification, lacking as it is a disclosure forming a basis for the claims. Further, the specification does not supply a description of the invention as required by the first paragraph of the section.

Defendant's second major attack upon the validity of the patent is premised upon 35 U.S.C.A. § 102. The pertinent part of that section entitles a person to a patent upon his invention unless the invention was patented or described in a printed publication in this or a foreign country or in public use or on sale in this country more than one year prior to the date of the application for patent in the United States. Defendant claims that Hinde's early installations amount to such public use.

As before indicated, the plaintiff Hinde did sell certain equipment prior to the date of December 26, 1962, which was the date Hinde applied for the '123 patent. If, however, the plaintiffs are entitled to rely on the filing date of the '861 patent, which was November 13, 1961, certain of such sales are within the limitation period provided for in Section 102, i. e., the sales were made and the equipment was placed in use within the one-year period preceding the filing of the application for the '861 patent.

35 U.S.C.A. § 120 provides in part that an application for a patent for an invention disclosed as provided for in paragraph one of Section 112 of the Patent Act in an application previously filed shall have the same effect as though filed on the date of the prior application if it contains a specific reference to the earlier filed application.

The defendant argues that the invention claimed in the subsequent application for the '123 patent is not disclosed in the full, clear, concise and exact terms required by Section 112 in the preceding application for the '861 patent, so that the plaintiffs are not entitled to the benefit of Section 120.

It should first be noted that great weight must be given to the findings of the Patent Office if they are consistent with the evidence presented at trial. McCullough Tool Company v. Well Surveys, *supra*; Johns-Manville Corp. v. Ladd, 117 U.S.App.D.C. 262, 328 F.2d 563 (1964). A review of the records from the Patent Office reflect that ultimately the Patent Office was satisfied with the precision and clarity of Claims 8 and 21. In addition, the drawings and specifications of the '123 and '861 patents, the testimony adduced at trial, and the courtroom demonstration are persuasive that the defendant failed to sustain its burden of proving either the affirmative defense of invalidity based upon indefiniteness under 35 U.S.C.A. § 112 or the affirmative defense under 35 U. S.C.A. § 102 barring the patenting of an invention that is in public use or on sale more than one year before the date of the patent application.

Claims 8 and 21 of the '123 patent do particularly point out and claim Mr. Hinde's invention, the specifications of both the '123 and the '861 patents contain written descriptions that comply with the requirements of Section 112, and Claims 8 and 21 of the '123 patent are completely disclosed in the '861 patent.

The '123 patent relates to the method and means for treatment of bodies of water with air or gas for specific purposes, including the complete treatment of domestic sewage in a pond or lagoon. Such bodies are treated through the use of hydraulically created and maintained straight elongated curtains formed by the upward laminar flow of aerated or gasified liquid or water above submerged conduits made of slitted flexible tubing which release streams of bubbles over straight elongated paths. The hydraulic curtains thus formed subdivide the body of liquid into a series of hydraulically defined and maintained treatment cells wherein the liquid undergoes recirculation and in which controlled aerobic treatment is carried out.

The patent discloses that no matter which of its stated purposes the invention is used to achieve, use is made of the plurality of submerged conduits in a predetermined pattern where they are spaced in straight lines parallel to each other, so that the release of air bubbles from the conduits creates and maintains above each conduit upward laminar flow of a straight curtain of aerated water and forms recirculation currents which divide the liquid into a series of parallel, hydraulically defined cells.

In further describing the functioning of the tubing, the '123 patent refers to co-pending application Serial No. 151,819 (the '861 patent) for a proper method of releasing air or oxygen-containing gas to create and maintain above each conduit the upward laminar flow of a straight curtain of aerated water. It also states that the hydraulic curtains thus formed part in opposite directions at the water's surface and form downward recirculation currents of the water between each pair of curtains, dividing the water into a series of cells which are maintained so long as the upward laminar flow above each conduit is maintained.

The '123 patent discloses several embodiments illustrating ways in which the invention described may be practiced. Figures 1 and 2 show a sewage lagoon having submerged conduits installed

therein in a pre-arranged pattern dividing the water in the lagoon into a series of parallel, hydraulically defined, aeration treatment cells and indicating, in Figure 2, the different sizes of such treatment cells. Figures 1 and 2, as described by the pertinent portions of the specifications, are shown by the evidence to correspond to the Hot Sulphur Springs installation. Utilized in the embodiment of Figures 1 and 2 is the weighted flexible tubing having narrow rows of self-closing slit valves in the upper portion thereof. The tubing is laid in parallel lengths on the bottom of the lagoon transversely to the direction of the flow. Figure 12 shows a length of such tubing and Column 4, line 67, to column 5, line 2 of the specification of the '123 patent describe it. Column 4, lines 63 to 67 refer to the '861 patent, and a more detailed description of the tubing is found there.

In the '123 patent are instructions on how to obtain the desired control and variation of the release of bubbles by varying either the spacing or the length, or both, of the slit valves. The patent points out that bubbles under one-eighth of an inch diameter tend to rise with a minimum of spreading and create laminar flow, whereas larger bubbles tend to create non-laminar flow, and it indicates that in all cases the bubbles are released from the tubing in such a manner that they rise straight up with a minimum of merging and an absence of turbulent flow.

The '123 patent also contains a thoroughly detailed description of the construction and operation of the installation illustrated in Figures 1 and 2, as well as specific information for treating domestic sewage for 500 to 600 people in a five-foot deep pond and for up to 1,200 people in a ten-foot deep pond. The sewage treatment lagoon shown on Figures 1 and 2 of the '123 patent is fully described as to construction and operation in Claims 21 and 8, respectively.

It should be noted that the file wrapper shows that the '123 patent corresponds to the application for it, except that language of the '861 patent was introduced into Claims 1 and 21, among others, to recite the bubble size that produces upward laminar flow and to bring out that the slit valves extend substantially the full length of the tubing in a narrow row, usually only one slit wide, and are spaced sufficiently close together to produce streams of bubbles that will produce upward laminar flow.

The earlier '861 patent, covering the distribution of fluids into bodies of liquid, states that in most uses the distributed fluid will be air and the body of liquid will be water. Among the listed examples of such bodies of liquid are ponds, lakes, aeration ponds, sewage or industrial waste treatment tanks, and waste stabilization ponds.

The '861 patent provides for a method and apparatus for imparting and maintaining circulation patterns and rates in bodies of water by use of flexible weighted tubing having a plurality of short self-closing slit valves along the length of the tubing. Several specific forms of the tubing are described and shown in Figures 4 through 17 of the drawings. The flexible weighted tubing shown in Figure 10 of the '861 patent corresponds to that shown and described in Figure 12 of the '123 patent and shown as used in the lagoon of Figures 1 and 2 of the '123 patent.

Also described in the specification and shown in Figure 1 of the '861 patent drawings is a system that would be used for ice melting. It includes a description of how the one-eighth inch bubbles produced by the tubing rise upward, causing laminar flow, and discloses how, partly by the bubbles' lifting motion and partly by their dissolution in the water, the water is caused to become less dense and to rise as a narrow elongated column or curtain between opposite walls of cold water. The importance of having upward laminar flow of warm bottom water with a minimum of mixing with the colder upper layers of water in order to melt an outline of the ice is ex-

plained, and it is pointed out that, once such an outline is melted, the wind and wave action accomplished the balance of the ice melting.

Figure 3 of the '861 patent is offered as an installation suitable for aeration of large open sewage treatment ponds as well as for ice melting. No description of its operation with regard to the release of air and the creation of curtains of water above each length of tubing, such as are described in detail in connection with Figure 1 of the patent, is offered in connection with it. However, it does state that it is useful for both ice melting and sewage treatment, and, thus, the description pertaining to Figure 1 is equally applicable to Figure 3.

Claims 8 and 21 of the '123 patent correspond, as to operation and as to construction, respectively, to Figure 3 of the '861 patent and the pertinent portions of that patent's specification. In particular, Claim 21 is adequately disclosed in Figure 3 when the aeration equipment shown in Figure 3 is installed in a sewage lagoon typical of that time such as was described by both plaintiffs' and defendant's experts.

■ Thus, Claims 8 and 21 are disclosed in the '861 patent application, and it follows that they are entitled to the benefit of the filing date of November 13, 1961.

Establishment of the '861 patent's filing date as the critical date eliminates certain of the installations as potential bars under Section 102(b). The installations at Butterfield Estates, Tinley Heights and Tuscola were all made in the summer of 1961 and were all within the preceding one-year period allowed by Section 102(b).

This leaves the question of whether the 1959 installation of Montague Fish Hatchery was a public use under Section 102(b) more than a year prior to the filing date of the '861 patent.

This installation was made in a shallow oval trout pond. As indicated before, two successive sets of perforated tubing were installed at Montague. The first tubing, perforated with round holes and weighted with taped-on lead wire, failed to perform. The second tubing sent was also weighted with taped-on lead wire, but it had slitted holes punched in it. The second tubing also failed to operate satisfactorily.

■ The defendant has claimed that all of the elements of the invention, or their equivalents, are found in the Montague installation where they do substantially the same work in substantially the same way. It must establish this claim by clear and convincing evidence. Scaramucci v. Dresser Industries, Inc., 427 F.2d 1309 (10th Cir. 1970). This defendant has failed to do. The evidence remains that there are significant differences in the purpose of the installation, in the configuration of the pond and in the equipment used, its placement, and its performance in the pond.

■ While the finding of dissimilarity disposes of the claim of public use, the time of installation and the type of equipment installed at Montague would support the further finding that the installation was an experimental one in Hinde's development of his concept. The testimony of Mr. Hinde and the deposition testimony of Mr. Cecil Ellison of the hatchery reflect that the installation was an experiment. Not all uses constitute a public use within the meaning of the statute. An inventor should be accorded sufficient time to perfect his invention, and the time which elapses during this period should not be computed as part of the one-year period provided for by Section 102(b). Universal Marion Corporation v. Warner & Swasey Company, 354 F.2d 541 (10th Cir. 1965); Atlas v. Eastern Air Lines, Inc., 311 F.2d 156 (1st Cir. 1962).

The defendant also has charged publication of a brochure of Hinde Engineering Company which advertised the Air-Aqua System for the prevention of summer and winter fish kill was tantamount to a placing of the invention in Claims 8 and 21 on sale more than one year before the filing of the '861 patent appli-

cation. This brochure shows the Montague installation, as well as an installation at Fisherman's Dude Ranch. The evidence shows that the Dude Ranch installation, like Montague, does not meet Claims 8 and 21 of the patent in suit. The document upon which defendant relies fails to disclose, as to either installation, the offer for sale of a system that meets the subject matter of Claims 8 and 21 of the '123 patent.

Defendant's final challenge to the validity of the '123 patent is based upon 35 U.S.C.A. § 103, which requires the subject matter covered by the patent application not to have been obvious at the time the invention was made to a person having ordinary skill in the art to which the subject matter pertains.

■ Under Section 103, the following three conditions must be satisfied: (1) the scope and content of the prior art are to be determined; (2) differences between the prior art and the claims at issue are to be ascertained; and, (3) the level of ordinary skill in the pertinent art is to be resolved. Graham v. John Deere Co., 383 U.S. 1, 16, 86 S.Ct. 684, 15 L.Ed.2d 545 (1965). As indicia of obviousness or non-obviousness, such secondary considerations as commercial success, long felt but unsolved needs, and so forth, may be utilized to give light to the circumstances surrounding the origin of the subject matter sought to be patented. *Ibid.* at 16–17, 86 S.Ct. 684.

To show that the claims in the patent in suit were obvious under Section 103 at the time the invention claimed was made, defendant first relies upon an article by O'Connor and Eckenfelder entitled, "Treatment of Organic Wastes in Aerated Lagoons," Journal of the Water Pollution Control Federation, April, 1960. The article, together with either the Coppock tubing or the Hinde tubing used at Kenosha Trout Club, Montague Fish Hatchery, and that offered for sale on November 19, 1960, through the brochure sent out by Hinde Engineering, are intended to demonstrate that more than one year before the application for the '861 patent all the essential elements of Claims 8 and 21 were known.

That which is covered both by the article and Claims 8 and 21 is asserted to be as follows. The article sets forth a system for aerated waste lagoons showing an elongated lagoon with a generally uniform depth and an inlet at one end with an outlet adjacent to it at the opposite end. Further, it deals with the application of aeration and oxidation principles to the treatment of waste in a lagoon by the use of air headers carrying spargers at appropriate spaces.

While admitting that the systems described in the article have turbulent characteristics, defendant claims that any person with ordinary skill in the pertinent art would be able to substitute the tubing used by Hinde in 1958, 1959, and 1960 for the air headers and spargers, so that a laminar flow of small bubbles would be produced.

The above assertions either minimize or overlook significant differences between the plaintiff's invention and what is discussed in the article. The article admits that turbulence is characteristic of the system described. Further, nothing in the article indicates that treatment cells are formed by the use of the header-sparger arrangement. Having certain elements in common with Claims 8 and 21 is not enough for the article to stand as persuasive evidence of prior art that makes the invention obvious.

Nor are its deficiencies overcome by the claim that substitution of Coppock's tubing or Hinde's early tubing for its header-sparger arrangement would produce small bubbles and upward laminar flow so as to satisfy Claims 8 and 21.

The tubing offered for sale on November 19, 1961, was not in public use or on sale more than one year before the November 13, 1961 filing date of the '861 patent, and it cannot be considered as part of the prior art with respect to the claims in suit. Illinois Tool Works, Inc. v. Solo Cup Company, Inc., 461 F.2d 265 (7th Cir. 1972).

As for the Coppock tubing, it was considered by the Examiner when the '123 patent was applied for and was found not to represent prior art. The tubing there disclosed does not produce laminar flow but, on the contrary, produces turbulent flow. In contrast to the Hinde tubing claimed in the '861 patent, Coppock tubing, while providing for slits for the release of air, provides for many slits to give an area release of air bubbles. Even defendant's expert testified that the Coppock tubing was substantially different.

With regard to whether it was obvious that the application of the early Hinde tubing to the article relied on would satisfy Claims 8 and 21, it is true that the manner of release of the small bubbles from that perforated tubing would put oxygen into the waste lagoon discussed in the article. But this is not enough to meet Claims 8 and 21. The tubing in question released very small amounts of air as opposed to the substantial air discharge capacity of the header-sparger arrangement. In the article, no more than two headers are used to aerate the lagoon. Two lengths of Hinde's tubing would not provide the air required. The concept of substitution would require a different quantity and arrangement of the substituted tubing than that set forth in the article. It cannot be said that the substitution was obvious prior to November of 1960 or that one having the ordinary level of skill would have realized it. The article and available tubing, without more, do not invalidate the patent in suit for obviousness.

In reliance on the above article, defendant asserts that Claims 8 and 21 are unpatentable because they are a combination of old elements which, in the aggregation, perform no new or different function or operation than that therefore performed by them. In this regard, defendant claims that the system described in the article does not differ functionally from that described in the patent in suit and that the use of flexible tubing in a sewage treatment lagoon

achieves the same results of burning up organic debris and gently circulating water to the surface as it did in the early installations at Montague Hatchery and Fisherman's Dude Ranch.

This argument likewise is without merit, for it overlooks the facts (1) that the system described in the article does not provide for the creation of hydraulically defined cells, while the system set forth in Claims 8 and 21 does, and (2) that the tubing is used in Claims 8 and 21 to create such cells, a function not called for in the fish installations.

Also relied on by the defendant to show the state of the art prior to the time of plaintiff's invention is an article published in 1952 by the Federation of Sewage and Industrial Wastes Association. Entitled "Air Diffusion in Sewage Works," it is the association's Manual of Practice No. 5. In its discussion of the various factors affecting the rate of oxygen dissolution in water, it demonstrates that the idea of using small bubbles did not originate with the plaintiff Hinde. However, this, too, fails to make the claims here in suit obvious.

As further proof of the obviousness of Claims 8 and 21, defendant offers an activated sludge process figure or drawing and some commentary from Martin, *The Activated Sludge Process,* published around 1930, and claims that the O'Connor and Eckenfelder article, plus the availability of flexible tubing, and the excerpt from this book would make the subject matter of Claims 8 and 21 obvious to a person having ordinary skill in the art at the time the invention was made.

The figure from the Martin book is relied on to show that the plaintiff Hinde did not originate the concepts of hydraulically defined cells or downward recirculation. The figure shows a transverse, parallel arrangement of a multiplicity of diffusers. Defendant claims that the arrangement shown would suggest to one skilled in the art the proper arrangement of flexible perforated tubing for air diffusion in a lagoon.

Defendant also points out that the Martin reference was not before the Examiner, so he was unable to use it to challenge the plaintiff when he distinguished his invention from one of the Examiner's references by stating that that reference (Babbitt) did not suggest the establishment of cells with downward recirculation between upward curtains of aerated liquid. In other words, the Martin reference, according to defendant, would have filled the gap.

The file wrapper does show that the Examiner considered the "ridge and furrow" arrangement, as discussed by Martin, both in the reference to Babbitt, Sewerage and Sewage Treatment, 6th Ed., 1947, and in the reference to Jones Patent No. 1,341,561. Figure 5 of the Jones patent depicts the same arrangement as does the Martin figure, so that what would have been disclosed to the Examiner by a reference to Martin was otherwise disclosed to him.

While the defendant's expert testified at length about the "ridge and furrow" arrangement in general, he was at no time questioned specifically by defense counsel on the Jones patent. His testimony as a whole indicated that the ridge and furrow arrangement differed significantly from the process defined in Claims 8 and 21, particularly in that the former requires that air be used to promote violent mixing throughout the aeration tank and to prevent settling of sludge to the bottom of the tank with its elevated cones or ridges and its furrows in between. He admitted that such a process would not have been suitable for the installation at Hot Sulphur Springs.

The disclosure in Martin of a ridge and furrow arrangement plus Hinde's early tubing do not make obvious the claimed subject matter as a whole, since it pertains to a system structurally and operationally different from the activated sludge process. Neither singly, in various combinations, nor cumulatively do the prior art references relied on by defendant show obviousness by the clear and convincing evidence required to overcome the presumption of validity attached to the patent. Eimco Corporation v. Peterson Filters and Engineering Company, 406 F.2d 431 (10th Cir. 1969).

The defendant's heavy reliance upon the activated sludge process as the closest prior art, when the full equivalent of what it presented as such prior art had been considered by the Patent Office, enhances the presumption of validity attached to the patent in suit. Mott Corporation v. Sunflower Industries, Inc., 314 F.2d 872 (10th Cir. 1963).

■ Defendant finally asserts that plaintiffs' failure to disclose to the Examiner their highly relevant prior uses of the early Hinde tubing in the installations at Montague Fish Hatchery constitutes fraud on the Patent Office and renders the patent in suit unenforceable.

Unenforceability is a defense under 35 U.S.C.A. § 282 in a suit for patent infringement. Fraudulent procurement of a patent is one ground for holding a patent unenforceable under Section 282.

Throughout the trial defendant premised its claim on fraudulent misrepresentations to the Examiner about the criticality of bubble size, laminar flow, slit valve arrangement and other details. In its post trial brief it now asserts instead fraudulent procurement based upon concealment of prior uses of the early Hinde tubing which, it claims, was done intentionally so as to mislead the Examiner into believing that Coppock was the closest art.

Defendant's late shift in grounds is not an approved practice, but, in any event, it has failed to sustain its burden of proof on the defense now asserted. It has not established that the plaintiff Hinde wilfully and intentionally misrepresented anything to the Examiner. See Kolene Corporation v. Motor City Metal Treating, Inc., 440 F.2d 77, 83 (6th Cir. 1971).

The patent in suit having been found to be valid, it remains to be determined whether it is infringed by the installation at Hot Sulphur Springs, Colorado.

The evidence establishes that what is offered by plaintiffs as their Air-Aqua

system coincides with what is disclosed in Claims 8 and 21 of the '123 patent and can be operated and constructed, respectively, therefrom.

The evidence also discloses that the plaintiffs sent to their Denver representative layout drawings, design specifications, data and calculations for an Air-Aqua system for the defendant, and that all such information was transmitted by their representative to defendant's consulting engineers. It further discloses that such information was used by defendant's consulting engineers to prepare the plans and specifications for the installation. These plans were used to obtain bids and were essentially followed in constructing the installation except that Schramm tubing was substituted for Air-Aqua tubing. The change order approving this substitution was initiated by the supply subcontractor Case/Cotter, Inc.

The "as-built" plans correspond to the bid plans in all important respects, and the installation conforms to them.

The evidence establishing that the design of the installation originated with plaintiffs and that the installation conforms to them is almost overwhelming.

Defendant argues that, in the tests run on the Schramm tubing taken from the accused installation, turbulent, not laminar, flow is shown. Hence, it asserts, the doctrine of equivalents cannot be applied, since plaintiffs urged the distinction of their laminar flow over the turbulent flow of the Babbitt reference, making it a material limitation on Claims 8 and 21. It is agreed that "laminar" is a material limitation. The courtroom tests, however, show that the Air-Aqua tubing and the Schramm tubing taken from the Hot Sulphur Springs installation produce the same kind of flow from the release of bubbles having the same size range. In addition, the testimony regarding the nature of the flow produced in the tests is persuasive that both tubes produced a curtain of aerated liquid that rose above them in laminar flow within the meaning of the patent disclosure. The demonstration conformed to what is set forth in Claims 8 and 21 of the '123 patent and what is disclosed in the specifications of that patent and the '861 patent. The explanation that accompanied the demonstration satisfactorily established that the results of the demonstration were equally applicable in an actual sewage lagoon. In addition, on-site observation of the installation by witnesses having knowledge of the Air-Aqua systems establishes that the Schramm tubing used at Hot Sulphur Springs produced a bubble pattern typical of an Air-Aqua installation.

The defendant attempts to escape infringement by showing that the Schramm tubing does not have a narrow row of slit valves but rather is composed of two side-by-side smaller tubes, each having a straight line of slit valves in its crest.

Plaintiffs' evidence, however, establishes that "narrow", as used in the patent in suit and in the '861 patent, or found in Column 5, lines 7–20, does not mean only a single line of slits one slit wide in the crest of the tubing. In addition, the file history of the '861 patent shows that, while the narrow rows of slit valves are usually only one slit wide, they can be wider. The file history can be relied on to help construe the patent. Texas Co. v. Anderson-Prichard Refining Corporation, 122 F.2d 829, 840 (10th Cir. 1941). Finally, it is established that the flexible tubing works the same way whether the slits are in a straight line or staggered.

In McCullough Tool Company v. Well Surveys, Inc., *supra*, 343 F.2d at 401, the tests of infringement are set forth. In essence, they are as follows: First, the words of the claims contained in the patent are examined and if the accused device falls clearly and definitely within those claims, infringement is made out. This is not conclusive, for infringement is more than a matter of mere words. The true test is whether the accused device and the device covered by the patent do the same work in

substantially the same way to accomplish the same result. Under the doctrine of equivalents, infringement may be established by determining equivalency against the concept of the patent, prior art and the particular circumstances of the case, without requiring complete identity for every purpose in every respect.

Claims 8 and 21 of the '123 patent almost completely read on the operation and construction, respectively, of the two sewage treatment lagoons in the accused installation. The minor differences between the claims and the installation are insignificant structurally and operationally, as was disclosed at trial and in deposition testimony. No violence is done the concept of the patent by them. The plaintiffs are entitled to use the doctrine of equivalents to overcome minor variations. Graver Tank & Mfg. Company, Inc. v. Linde Air Products Company, 339 U.S. 605, 70 S.Ct. 854, 94 L.Ed. 1097 (1950). The difference in the alignment of slit valves in the Schramm tubing from that in plaintiffs' tubing has been demonstrated to give no change in results.

It is clear that defendant copied plaintiffs' Air-Aqua system. The only material change made was to substitute the Schramm tubing—an equivalent—for plaintiffs' tubing. That substitution was initiated by Mr. Cotter after Mr. Schramm had visited his office and gone over the plans and specifications for the installation at Hot Sulphur Springs. The substituted tubing did produce laminar flow as that term is used in the patent.

While it is not necessary to the decision herein, it should be noted that plaintiffs have relied on commercial success and the fulfilling of a need not supplied by the art as proof of the validity of the patent. In response, defendant asserts that plaintiffs are successful in selling something that does not conform to the claims and, hence, the commercial success shown does not support the patentability of the claims. Specifically,

defendant claims that the size of some of the bubbles produced by various Air-Aqua systems are larger than one-eighth inch and produce turbulent flow, so that the Air-Aqua systems do not have upward laminar flow and do not conform to Claims 8 and 21. As was discussed above, this claim is erroneous. Further, the plaintiffs have sold approximately 300 of their Air-Aqua systems. It cannot be said no need existed.

The plaintiffs have asked that a permanent injunction issue against the town of Hot Sulphur Springs, Colorado, and against all its officers, agents, and employees, and against all persons under its control or in privity with it, from directly or indirectly infringing Claims 8 and 21 of the patent in suit, provided, however, the defendant town may continue to operate its existing sewage treatment facility. In this request plaintiffs would have Schramm, Inc., and Case/Cotter, Inc., included, on the basis that they are in privity with the town of Hot Sulphur Springs. The plaintiffs' contention in this regard is well-taken. The active participation of both in the management and direction of these proceedings and the indemnification by Case/Cotter, Inc., of the town of Hot Sulphur Springs, make binding upon them the decision in this action.

In support of their argument that they are entitled to treble damages and attorneys fees, plaintiffs first charge that the defendant and its privies deliberately and intentionally copied plaintiffs' patented system.

It is established that the proposal they sent for the Hot Sulphur Springs installation indicated that their system was patented, and that Mr. Case of Case/Cotter, Inc., admitted that he knew at least some part of the system was patented. The record shows that this knowledge existed at least in April of 1969. While it is not a matter of record that Mr. Schramm, when he conferred with Mr. Case and examined the drawings and specifications for the installation, knew of the plaintiffs' patent, it is

established that he knew of Hinde's activity in its early stages. Also pointed out is the fact that no one obtained an opinion of legal counsel, and that defendant, through its attorneys, first agreed in the pre-trial order that it knew of the patent as of April 23, 1969, and then, on the day trial opened, moved to amend its answer to deny this early knowledge. Plaintiffs claim this early admission was done to lull them into thinking it was not necessary to depose Schramm personnel to show that they also knew of the patent before infringing. It is significant that even after the last minute withdrawal of its admission of knowledge the defendant put forward no evidence to refute plaintiffs' evidence of knowledge on the part of Case/Cotter and Schramm.

Also relied on is the answer by the town mayor to an interrogatory from which it can be concluded that he knew prior to the bidding that at least part of plaintiffs' system was patented.

Plaintiffs also contend that other unfairness was manifested when Mr. Hinde arranged with the town mayor to inspect the installation. The mayor claimed that he told the town marshal to permit the inspection, but when he, Mr. Hinde, and Mr. Hinde's associate got to the installation, they found the gate locked. Further, when Mr. Hinde tried to climb the fence, he was threatened with a gun by the town marshal. All he was permitted to do was to view what he could from outside the fence and take pictures.

Last, plaintiffs claim that the attorneys for the defense did not even tell the defendant town of plaintiffs' settlement offer.

Defendant counters plaintiffs' argument about knowledge of the patent by suggesting that Case/Cotter was merely filling an order from the contractor and that plaintiffs could have called a Schramm representative who was availa-

ble at the trial to determine what, if any, knowledge Schramm had of plaintiffs' patent. However, this is merely an assertion by counsel and there is no evidence as to what, if any, knowledge the particular Schramm representative would have had. Further, it is significant that the witness was equally available to the defense to refute the evidence of knowledge. Defendant also asserts that the mayor's actions upon Hinde's visit to the installation were not wrong, and that the settlement offer was known to the attorney who was counsel both for the defendant town and Case/Cotter, which fully indemnified the defendant town.

This case is an appropriate one for the award of treble damages. The evidence establishes that the defendant's privies deliberately and intentionally set out to test the plaintiffs' patent by knowingly copying it in all material respects and in intentional disregard of Mr. Hinde's patent rights. See American Safety Table Company v. Schreiber, 415 F.2d 373 (2nd Cir. 1969). A clear showing of deliberate infringement has been made out, both against Case/Cotter, Inc., and Schramm, Inc., and, inasmuch as the defendant town left the case entirely in their hands and exercised no control over it, it is equally chargeable with their deliberate infringement.

Defendant's reliance on Lear, Inc. v. Adkins, 395 U.S. 653, 89 S.Ct. 1902, 23 L.Ed.2d 610 (1969) to avoid treble damages is misplaced. That case is not authority for condoning copying.

The court is of the further opinion that the case is not one calling for the awarding of attorneys fees under 35 U.S.C.A. § 285.

A Judgment in favor of the plaintiff will be entered herein, together with this Memorandum Opinion containing the Court's Findings of Fact and Conclusions of Law.