**FORBRO DESIGN CORP.**

v.

**RAYTHEON CO.**

Civ. A. No. 69–343–F.

United States District Court,
D. Massachusetts.

Feb. 7, 1975.

David A. Rich, Boston, Mass., for plaintiff.

Henry C. Nields, Russell & Nields, Boston, Mass., for defendant.

## OPINION

FREEDMAN, District Judge.

This patent infringement matter was tried by the Court without a jury at Springfield, Massachusetts for eight days concluding on June 14, 1974. Subsequently, the parties filed extensive briefs and proposed findings of fact and conclusions of law. After careful consideration of the evidence, stipulations and pertinent authorities, the Court hereinafter enters its findings in accordance with Federal Rule of Civil Procedure 52(a).

The case was brought by Forbro Design Corporation [1] ("Forbro"), a New York corporation, against Raytheon Company ("Raytheon"), a Delaware corporation with a regular place of business in Lexington, Massachusetts, charging infringement of United States Patent No. 3,028,538, which is held by Forbro as assignee. Defendant denies infringement and avers that the patent is invalid for lack of novelty and for obviousness. It further alleges invalidity under 35 U.S.C. § 102(b) because the invention was on sale for more than a year prior to the date of application for the patent. There is an allegation of unenforceability under 35 U.S.C. § 135(c) for failure to file a document with the Patent Office during the course of an Interference in 1962–1965.[2] Raytheon further claims that the patent is unenforceable for alleged fraud in its procurement and during the Interference. Finally, it charges Forbro with a violation of the antitrust laws in its use of Patent No. 3,028,538.[3]

Before undertaking the task of determining the validity, *vel non*, of the highly technical patent in suit, the Court calls to mind the words of Mr. Justice Frankfurter in Marconi v. United States, 320 U.S. 1, 60, 61, 63 S.Ct. 1393, 1421, 87 L.Ed. 1731 (1943) (dissenting in part):

It is an old observation that the training of Anglo-American judges ill fits them to discharge the duties cast

1. Plaintiff was organized by four brothers—Kenneth, Jesse, Jack and Max Kupferberg. The brothers are also the sole stockholders of Kepco, Inc. Forbro holds the patents for the devices manufactured by Kepco.

2. Defendant brought a motion for summary judgment on the § 135(c) issue. The matter was heard by Judge Ford who denied the motion, 321 F.Supp. 1029 (D.Mass., 1971), holding that material issues of fact remained in issue.

3. Plaintiff moved for summary judgment on the antitrust counterclaim. This motion was denied by this Court in an unreported order dated August 30, 1973.

upon them by patent legislation. The scientific attainments of a Lord Moulton are perhaps unique in the annals of the English-speaking judiciary. However, so long as the Congress, for the purposes of patentability, makes the determination of originality a judicial function, judges must overcome their scientific incompetence as best they can. [Footnote omitted.]

I view this sentiment as particularly apposite in the case at bar.

### Patent in suit

United States Patent No. 3,028,538 is owned by plaintiff Forbro. The application was filed on August 4, 1958, by Aaron Rosenfeld and Kenneth Kupferberg (a principal of plaintiff corporation), and the patent issued on April 3, 1962. It was thereupon assigned to plaintiff. On June 14, 1966, the name of Rosenberg was deleted as an inventor and Kupferberg now appears as the sole inventor. As originally issued the patent contained seven claims. As will more fully appear later in this opinion, claim 5 has been disclaimed and claims 6 and 7 are not being asserted by plaintiff. Defendant is charged in this case with infringing claims 1–4.

On October 15, 1962, the Patent Office declared an Interference between plaintiff and Hewlett-Packard Company based upon the fact that Hewlett-Packard was making the same claims as those which appear in the patent in suit under an assignment of application No. 737788 by the inventors Bahrs and McWhorter. The Interference was ultimately decided in 1965 only upon claim 6 and plaintiff's assignors were held to have the prior claim.

The patent in suit is entitled "Regulated Output Voltage Power Supply." Preliminarily, it might be well to attempt to understand in a general way the power supply field. Power supplies are old in the electronics art, dating back to the early days of radio. One rudimentary use of the power supply is in a television set. House current is alternating current (ac) voltage; televisions require direct current (dc). The power supply converts this ac voltage to dc voltage. The dc voltage powers the load circuit in the television. Fluctuations in the input of ac voltage or the output dc voltage will not seriously affect the operation of the television.

However, in more sophisticated electronics equipment such as computers, minor fluctuations in the voltage can seriously impair the accuracy of operation. Thus the goals in designing such power supplies are accuracy and stability. The accuracy at any voltage put out by the supply must be in the order of thousandths of a volt in sophisticated electronics gear. And once set at that output voltage, it must remain stable at that setting. Other requirements in addition to accuracy and stability are portability and efficiency.

Regulated power supply circuits have a means for monitoring the source of the dc voltage and the load circuit, so that if either should fluctuate the circuit can compensate for these fluctuations and maintain the constant current into the load circuit. To accomplish the regulation there must be a stable reference voltage, such as a battery, against which to measure the voltage; changes in the balance and the output can then quickly be detected and compensation will take place to ensure that the power being supplied is constant.

The patent in suit is directed to power supplies in which the dc voltage provided by the supply to a load circuit is automatically regulated to remain substantially constant regardless of voltage fluctuations. In view of the relatively short text of the patent in suit, I have appended the patent, including the drawing of one possible embodiment, to this opinion as Appendix "A".

As appears in col. 1, ll. 12–17 of the patent—

. . . the invention is directed to a standardized reference unit and a control amplifier assembled as a plug

in unit for connection to an unregulated supply and providing an output voltage always equal to the value set on a voltage control, a feature of the unit being adjustability of the output voltage to zero volts.

It further provides, in col. 1, l. 25 et seq., that—

. . . a single regulated power supply could be used with a diversity of sources of unregulated voltage, . . . by connecting the voltage reference, the control amplifier, the voltage control, and the load into a bridge type reference network.

The descriptive material then goes on to explain a typical embodiment of the circuit as per the drawing.

It is unnecessary to describe each circuit as set out in claims 1 through 4, since these claims appear in full in Appendix "A". The question for the Court, at this stage, is whether the invention as described in the claims is patentable under the standards set forth in 35 U.S.C. §§ 101, 102, 103. For these purposes, I next turn to an examination of the prior art.

*Prior art*

The prior art, for purposes of this case, includes patented and unpatented circuits hereinafter described, as well as several stipulations of the parties which will be cited from time to time and appear in Appendix "B".

The only prior art cited in the patent was Chase, U.S. Patent No. 2,751,549. Since at trial neither party raised this as pertinent prior art, there is no need to consider it here. There remain for consideration as prior art two circuits, and perhaps a third. The parties agree that U.S. Patent No. 2,840,777 ("De-Blasio") is included in prior art, as well as Kepco Model 2600.[4] The third circuit cited by defendant as prior art—Kepco

Model 5947—raises an issue to which the Court now turns.

Model 5947 was a transistorized power supply with a circuit which was in many respects similar to that of the patent in suit. Defendant's contention is that the two circuits are so close as to raise a defense under 35 U.S.C. § 102(b); i. e. that if the 5947 were sold more than one year prior to the filing of the application for the patent in suit, it is thereby invalid. I will address this "on sale" issue in greater detail at a later point. At this stage the Court finds that the 5947 as a separate design is not a part of the applicable prior art for the circuit of this patent. The two circuits were being developed simultaneously and there is no evidence which would warrant a finding that the circuit of the 5947 was known prior to the time of conception of Patent No. 3,028,538—early March, 1957.

A. *DeBlasio*

DeBlasio entitles his patent, "Direct Current Power Source", and describes a ". . . regulating method and means wherein vacuum tube voltage-regulator circuits are used to maintain a constant D.C. output voltage across the load, . . ."[5] col. 1, ll. 17–20. DeBlasio contains many of the same elements as the patent in suit: a reference voltage source, a series pass element, and a control amplifier (which DeBlasio denominates an Input Comparator). Rather than examine the intricate workings of the DeBlasio circuit, the Court will examine the differences between DeBlasio and the patent in suit as noted by plaintiff and the similarities pointed out by defendant.

Plaintiff's witnesses describe three features of Patent No. 3,028,538 which they contend are not described or disclosed by DeBlasio—a common point, a

---

4. Plaintiff does not regard the 2600 as pertinent, but concedes that it was prior to the patent in suit.

5. It is stipulated that the use of transistors as in the patent in suit in place of tubes is old in the art. Stipulation 27, Appendix "B".

universal low-voltage amplifier, and a small voltage reference:

1. common point: a terminal such as terminal 21 of the patent in suit where the circuit of the series pass element, the reference circuit, one terminal of the load, and a circuit of the control amplifier are inter-connected.

2. universal low-voltage amplifier: the connection of the elements is such that one amplifier can control a broad spectrum of output voltage settings.

3. small voltage reference.

Defendant's position is that DeBlasio does disclose a circuit with the common point. Although neither figure 2 nor figure 4 [6] show such a common point, a reading of col. 6, ll. 14–30 [7] does describe such a circuit. That is, in figures 2 and 4 the pass element is on the positive side of the load, but in col. 6, ll. 14–30, the patent discloses the pass element on the negative side, thereby describing the common point claimed by plaintiff. Defendant further points out that even using figures 2 and 4, the common point is formed if Stipulation 28 is read into the drawings.[8] Defendant asserts that the connection made using Stipulation 28, i. e. with the pass element on the negative side, permits the advantage of a standardized control amplifier as well as the common point.

## B. *Model 2600*

Kepco Model 2600 [9] is a vacuum-tube type of power supply utilizing a series-

pass element, a 500-volt reference voltage connected across resistor R21 and a group of gas tubes, and a control amplifier V7.

Plaintiff maintains that while this circuit is admittedly prior art it is not close enough to the circuit of the patent in suit to require citation to the Patent Office as applicable prior art. It has a reference voltage of large magnitude and does not have the same bridge-like connections as appear at 21, 22 of the patent in suit. The corresponding points of the 2600 are removed from the bridge-like connection by resistors R8 and R21. The series pass element is in the positive leg and is connected to the positive terminal of the output circuit.

Defendant submits that the 2600, with the addition of the concept contained in Stipulation 28, results in a circuit with the common point and its attendant advantages. It is clear that the use of transistors in Patent No. 3,028,538 constitutes no patentable advantage of the 2600. Stipulation 27.

### Defendant's Expert Witness

Prior to entering my conclusions on the validity issue, it might be well to address a subsidiary matter raised by plaintiff at trial and in its brief. Forbro questions the qualifications of defendant's expert Knutrud to testify as to the state of the art in 1957 and to whether the circuit would have been obvious " . . . to a person having ordinary skill in the art . . ." at that time. 35 U.S.C. § 103.

---

6. Figures 2 and 4 of DeBlasio are set out as Appendix "C".

7. Col. 6, ll. 14–30:
 As shown in Figs. 2 and 4, my improved direct current power source embodies an electrical bridgelike configuration wherein the source of current E with the series regulator tube, element or system 21 plus the reference potential $E_R$; forms one arm of a bridgelike configuration and wherein resistances R1 and R2 form the other arm of the latter. The balanced detector or comparator tube or input system 35, connected as shown, senses the null points of the bridgelike configuration.

One of these null points might be considered to be at a point on the input comparator line or connection 33 to grid 34, for example, at N2. The other null point might be considered to be a point on the connection to grid 44, for example, at N1. The input comparator system or tube 35 therefore operates with both "sensing" elements 34 and 44 thereof at a potential zero with respect to the potential of the negative line 16.

8. See Stipulation 28, Appendix "B".

9. A diagram of the 2600 appears as Appendix "D".

Mr. Knutrud had graduated from Massachusetts Institute of Technology in 1955 and, while he conceded that he was not an expert in the power supply field at the time, I find that his qualifications were adequate in the area of circuit design as of the pertinent time to permit him to testify as a " . . . person having *ordinary skill* in the art . . . " [Emphasis added.]

*Validity*

Defendant argues that the patent in suit is invalid under both § 102 and § 103 of Title 35 of the United States Code. This Court is not prepared to hold that the patent is void for anticipation under § 102. Defendant cites DeBlasio as fully anticipating the patent in suit. Its argument is that col. 6, ll. 14–30 of DeBlasio[10] describes and discloses a circuit identical to that of the patent in suit. Such a conclusion demands that the two circuits satisfy a highly technical standard of identity. While this " . . . test of patentability . . . is frequently invoked by the Patent Office in refusing to grant patents, it only rarely provides the sole basis for adjudication denying patentability . . . " Saf-Gard Products, Inc. v. Service Parts, Inc., 370 F.Supp. 257, 267 (D.Ariz., 1974), and cases cited. This identity has not been demonstrated to my satisfaction. Accordingly, I hold that Patent No. 3,028,538 is not invalid for anticipation under 35 U.S.C. § 102.

The Court next turns to the question of invalidity under 35 U.S.C. § 103. This section, added to the statute in 1952, provides in pertinent part:

A patent may not be obtained though the invention is not identically disclosed or described as set forth in section 102 of this title, if the differences between the subject matter sought to be patented and the prior art are such that the subject matter as a whole would have been obvious at the time the invention was made to a person having ordinary skill in the art . . .

The Supreme Court examined § 103 and prescribed the approach that courts should employ in determining validity under this section in Graham v. John Deere Co., 383 U.S. 1, 17, 18, 86 S.Ct. 684, 694, 15 L.Ed.2d 545 (1966):

Under § 103, the scope and content of the prior art are to be determined; differences between the prior art and the claims at issue are to be ascertained; and the level of ordinary skill in the pertinent art resolved.

Such secondary considerations as commercial success, long felt but unsolved needs, failure of others, etc., might be utilized to give light to the circumstances surrounding the origin of the subject matter sought to be patented.

At the outset it should be noted that a patent generally enjoys a presumption of validity. 35 U.S.C. § 282. Plaintiff cites Mumm v. Jacob E. Decker & Sons, 301 U.S. 168, 57 S.Ct. 675, 81 L.Ed. 983 (1937), for the proposition that the burden of rebutting this presumption is a heavy one. It goes on to argue that the presumption is "enhanced" when the applicable prior art has been brought to the attention of the patent examiner. While it is undisputed that neither DeBlasio nor the 2600 was before the Patent Office at the initial prosecution of the application, plaintiff asserts that both were cited in the Interference file and thus were before the Patent Office entitling the patent in suit to the "enhancement" of the presumption of validity. In support of this contention Forbro points to the fact that the interference examiner ruled that claim 5 was anticipated by DeBlasio,[11] but left claims 1–4, 6 & 7 intact.

10. *Supra*, note 7.

11. Plaintiff later disclaimed claim 5 (Nov. 12, 1965).

Defendant disagrees with this position and argues that claim 6 (not in issue here) should have been found to be obvious in light of Stipulation 27 since it was merely a transistorization of claim 5. In view of the fact that claim 6 was left undisturbed, it seems clear that the examiner was not concerned with the patentability of claims. The Court of Customs and Patent Appeals had occasion to discuss the scope of Interference proceedings in Glass v. DeRoo, 239 F.2d 402, 44 C.C.P.A. 723 (1956):

> Our jurisdiction in a patent interference is limited to a review of the decision of the Board of Patent Interferences, 35 U.S.C. § 141. The jurisdiction of that board is limited to a determination of the question of priority of invention, 35 U.S.C. § 135. As to both the board and this court, certain questions which are "ancillary" to priority may also be considered. *Patentability is not one of these questions.* [Emphasis added.]

■ In light of these considerations, I hold that the presumption of validity of Patent No. 3,028,538 is not entitled to the "enhancement" of having had the relevant prior art before the examiner. On the contrary, the fact that some pertinent prior art was not before the examiner in the initial prosecution of the application somewhat weakens the statutory presumption. Scripto, Inc. v. Ferber Corporation, 267 F.2d 308 (3rd Cir.), cert. denied 361 U.S. 864, 80 S.Ct. 122, 4 L.Ed.2d 104 (1959); H. Schindler & Co. v. C. Saladino & Sons, 81 F.2d 649, 651 (1st Cir., 1936); Carleton Manufacturing Co. v. Fram Corporation, 201 F.Supp. 18, 22 (D.R.I., 1961).

■ Plaintiff concedes that none of the components in the patent in suit was new. It rests its case for validity upon the theory that the combination of the old elements creates a patentable invention. The test for combination patents was stated by the Supreme Court in Great Atlantic & Pacific Tea Co. v. Supermarket Equipment Corp., 340 U.S. 147, 152, 71 S.Ct. 127, 130, 95 L.Ed.2d 162 (1950): ". . . only when the whole in some way exceeds the sum of its parts is the accumulation of old devices patentable." *See* also, Sylvania Electric Products, Inc. v. Brainerd, 369 F.Supp. 468 (D.Mass.), aff'd, 499 F.2d 111 (1st Cir., 1974), and cases cited; General Radio Company v. Kepco, Inc., 435 F.2d 135 (2nd Cir., 1970), cert. denied 402 U.S. 1008, 91 S.Ct. 2189, 29 L. Ed.2d 430 (1971).

■ On the other hand, Great Atlantic & Pacific Tea Co. recognized that ". . . especially in chemistry or electronics [old elements may] take on some new quality or function from being brought into concert . . .," *supra,* 340 U.S., at 152, 71 S.Ct., at 130. For a determination under § 103 the invention should be looked at as a whole, and not element by element. It should be clear that hindsight has no place in an analysis under this section. The language of the statute is quite explicit in this regard: ". . . the subject matter as a whole would have been obvious *at the time* the invention was made . . ." 35 U.S.C. § 103. [Emphasis added.]

Applying these principles to the patent in suit the Court concludes that the patent is invalid. I do this relying upon DeBlasio and the stipulations in Appendix "B" as prior art.[12] The advances over prior art pointed out by plaintiff do not pass the test as set forth in § 103. As defendant's expert testified, the insertion of a PNP pass transistor in accordance with Stipulation 28 into the circuit of the DeBlasio patent results in the "common point" which plaintiff claims as part of its inventive concept. This connection also would provide a circuit with the advantage of a standarized control amplifier. Defendant's expert's testimony, coupled with the language of Stipulation 28, makes it clear that to make such a connection would have been obvious to one with ordinary skill in the art in 1957.

The final difference advanced by plaintiff as setting the circuit of the

---

12. Since DeBlasio is closer prior art than is Model 2600, it is unnecessary to decide whether the patent was obvious in light of the 2600.

patent in suit apart from prior art is a small voltage reference. There is no question but that the demonstration at trial utilized a small voltage reference. However, I find nowhere in the patent any language which requires such a reference in order to enjoy the advantages of the patent. The inventor, Dr. Kenneth Kupferberg, testified in a deposition [13] that the inventive concept is contained in the first few paragraphs of the patent. Neither in these paragraphs nor in claims 1–4 is there any disclosure of a small voltage reference. Thus the Court accords no weight to this claimed "difference".

 Plaintiff suggests in support of patentability that the invention has been commercially successful and, at the time of its reduction to practice, filled " . . . long felt but unsolved needs . . . " Graham v. John Deere Co., *supra*, 383 U.S. at 17, 86 S.Ct. at 694. There is no question but that the patent in suit has enjoyed commercial success. However, such a consideration is secondary in a determination of patentability and only becomes significant if the question of patentability is a close one. "Where . . . invention is plainly lacking, commercial success cannot fill the void." Jungerson v. Ostby & Barton Co., 335 U.S. 560, 567, 69 S.Ct. 269, 272, 93 L.Ed. 235 (1949), and cases cited.

There has been no showing that the patent in suit solved a problem that had remained unsolved. There was evidence that other power supply manufacturers were engaged in the transistorization of power supplies and the stipulations in Appendix "B" reveal that the technology

to arrive at the answers contained in the patent was available in the prior art.

 In view of the foregoing findings, the Court holds that the patent is invalid for obviousness under 35 U.S.C. § 103.

Although my decision on validity obviates the necessity of deciding several issues raised by the pleadings, in the interests of judicial economy it seems the better course to enter findings and conclusions on the remaining issues.

*Infringement*

At trial plaintiff's expert Barber read claims 1–4 of the patent in suit on the following power supplies manufactured by defendant: QSA Ranger, QRD/QRS, QRE, QHS, and SRL. It is clear that if the patent were valid the defendant has infringed as to these devices. Defendant's sole defense to infringement is that it is practicing prior art. If the circuit of the patent in suit is not part of the public domain and is truly inventive, it follows that defendant has infringed as charged by plaintiff.

*"On sale" issue*

 Raytheon has raised a defense under 35 U.S.C. § 102(b) alleging that the patent is invalid since " . . . the invention was . . . on sale in this country, more than one year prior to the date of the application for the patent . . . " This contention is based upon the sale of Kepco Model 5947 in 1957; defendant asserts that the invention contains no patentable difference over the 5947. In view of my findings as to the date of sale hereinafter set forth, I will assume without deciding that there is no patentable difference between the circuits of the two devices.[14]

---

13. Exhibit P, p. 43.

14. If this matter were in issue, the statements of Dr. Kupferberg, the inventor, and Robert Moog, the technician, would be persuasive in establishing the fact of identity between the patent in suit and the 5947:
Robert Moog (Exhibit P, pp. 65–66):

" . . . they [the patent in suit and the 5947] are not identical but one step away from being identical . . . operationally or functionally they are identical . . . "
Kenneth Kupferberg (Tr. p. 646):
" . . . I would say it [5947] is very close to what we were trying to get."

On April 24, 1957, Kepco received an order from the Army Signal Corps to provide six power supplies. These supplies (Model 5947) were eventually built from a preliminary design which appears in Exhibit M (the Interference file) at p. 111, and is dated April 16, 1957. Plaintiff, at p. 218, Exhibit M, states that a "satisfactory working model" had been built by the April 16 date. However, on June 26, the Signal Corps order still had not been filled and the time for delivery was extended to September 10, 1957. The power supplies embodying the 5947 circuit were finally shipped on September 16, 1957.[15]

It is defendant's position that a "satisfactory working model" as claimed by plaintiff when attempting to demonstrate diligence during the Interference, coupled with an order from the Signal Corps on April 24, 1957, is sufficient to establish the defense under § 102(b). Raytheon cites Atlas v. Eastern Airlines, Inc., 311 F.2d 156 (1st Cir., 1962), cert. denied 373 U.S. 904, 83 S.Ct. 1290, 10 L.Ed.2d 199 (1963), in support of its position. In *Atlas*, there had been a public use of a fully completed device. Apart from the fact that the case construed § 102(b), the Court fails to see what bearing it has on this case. Accordingly, I reject *Atlas* as inapposite.

B. F. Sturtevant Co. v. Massachusetts Hair & Felt Co., 124 F.2d 95 (1st Cir., 1941), and McCreery Engineering Co. v. Massachusetts Fan Co., 195 F. 498 (1st Cir., 1912), are apparently still the law in this circuit. They hold, in essence, that the controlling date for purposes of § 102(b), where an item had not yet been manufactured at the time of the order, is the date on which the order is filled, and not the date on which the order is first placed. *See,* also, Trico Products Corporation v. Delman Company, 199 F.Supp. 231, 251 (S.D.Iowa, 1961), appeal dismissed 304 F.2d 882 (8th Cir., 1962).

The Court concludes that the 5947 was not "on sale" more than a year prior to the date of the application for the patent in suit.

## § 135(c) Defense

The remaining issues in the case require an understanding of the Interference with Hewlett-Packard in 1962–1965. As indicated earlier in this opinion, the Interference was declared by the Patent Office on October 15, 1962 as to all seven claims of the patent. The examiner later determined that Hewlett-Packard could not make claims 1–4 and 7, and therefore dissolved the Interference as to these claims on September 23, 1964. At the same time he dissolved the Interference as to claim 5 since he found it to be fully anticipated by DeBlasio.

Prior to the dissolution of the Interference as to claims 1–4, 5 & 7, the parties had been engaged in negotiations with an eye toward possible settlement. Both of the parties to the Interference had several patents in the power supply field. On March 29, 1963, a non-exclusive, royalty-free, cross-license agreement was signed. This document which licensed each to use the other's patents, including the patent in suit, for a period of five years, was not filed with the Patent Office. Interference proceedings continued and the matter never went to settlement.

After the September 23, 1964 decision by the examiner, the Interference went before a three-man Board of Patent Interferences. A decision of this board was rendered on December 2, 1965; plaintiff was awarded priority with respect to claim 6.

35 U.S.C. § 135(c) provides in relevant part:

> Any agreement or understanding between parties to an interference, including any collateral agreements referred to therein, made in connection with or in contemplation of the termination of the interference, shall be in writing and a true copy thereof filed

---

15. The application for the patent in suit was filed August 4, 1958—less than a year after the shipping date.

in the Patent Office before the termination of the interference . . ..
Failure to file the copy of such agreement or understanding shall render permanently unenforceable . . . any patent of such parties involved in the interference.

Defendant asserts that the licensing agreement fits within the meaning of the statute and renders the patent unenforceable. This same argument was raised in the motion for summary judgment. Judge Ford, in denying defendant's motion, 321 F.Supp. 1029 (D. Mass., 1971), stated that there was an issue of fact as to whether the agreement satisfied the terms of the statute.

Plaintiff asserts that the issue is not relevant to a resolution of this case since the only claim decided in the Interference was claim 6, and this case relates only to claims 1–4. It contends that while the agreement was made during the pendency of the Interference, there was no connection between the settlement discussions and the licensing agreement.

I agree with plaintiff that the Interference was decided only upon claim 6 and thus the issue is not properly under consideration. If anything is to be rendered unenforceable, it should only be that claim. However, since the matter was fully tried, I will enter my findings and conclusions on this issue, should another court deem them to be relevant.

The evidence adduced at trial showed that there was an on-going relationship between plaintiff's patent counsel Barber (plaintiff's expert in this trial) and Jean Chognard, Hewlett-Packard's patent counsel. There were settlement discussions both before and after the signing of the cross-licensing agreement. A settlement was never consummated, however, and the parties filed written evidence with the Patent Office. The Board of Interference Examiners ultimately made its decision based upon this documentary evidence.

Plaintiff's position that the agreement was not connected with settlement discussions is simply untenable. It is true that the parties agreed to let the Board decide their dispute, but there can be no question but that the cross-license had to have had an effect upon the proceedings. After their agreement was signed, both parties had the right to use the patent in issue royalty-free, regardless of the outcome of the Interference. The Court is particularly struck by the deposition of Hewlett-Packard counsel Chognard on the question of the Interference decision:

Q: Why did you not appeal from the decision?

A: Mostly pressure of other work. We had a license under the patent, anyway, since we had at that time negotiated a fairly broad cross-licensing agreement with Kepco, and there wasn't enough economic interest involved as far as we were concerned to justify further expense.

And later in the same deposition:

Let me clarify one point as far as our mental state at the time was concerned: We had a sporting interest in winning the interference and you can see from the papers that we did quite a bit of digging and trying to get some evidence. But from a business standpoint we really didn't care whether we won it or not.[16]

The point is that there can be no doubt of a connection between the cross-licensing agreement and the resolution of the Interference. Whether the Interference is terminated by a settlement or by the Board is unimportant if the effect of an agreement is to remove the adversary character of the proceedings. The harm to the public from such an agreement is present in either situation. The legislative history of § 135(c) reflects this sentiment: "Interference proceedings may be terminated in a manner hostile

16. In all fairness to Mr. Barber, the Court notes that Mr. Chognard went on to say:

"I think Forbro had a real interest in winning this thing or Barber had a real interest in winning it."

to the public interest by using patent interference settlement agreements as a means of restricting competition." Senate Report No. 2169, U.S.Code Cong. & Admin.News, 87th Cong., 2nd Sess., p. 3286 (1962). This is not to say that there has been an antitrust violation or that the failure to file was fraudulent. Section 135(c) addresses itself only to filing requirements and it is only this filing requirement which I find plaintiff has violated in the prosecution of the Interference.

In view of the Court's previously articulated position that this failure to file is only effective as to claim 6, claims 1–4 are not unenforceable under the provisions of § 135(c).

*Fraud*

The Court has endeavored to make findings on the issues which were fully tried but unnecessary to reach in view of the finding of invalidity. The allegations of fraud raise a somewhat different problem. They present two distinct issues. The first is whether plaintiff's conduct amounts to fraud which would invalidate the patent. The second is whether plaintiff's activities violate the antitrust laws.

In asking this Court to find the patent invalid, defendant asserts, *inter alia,* that plaintiff's failure to advise the Patent Office of all relevant prior art during the initial prosecution and of the cross-license during the Interference is a breach of its duty of candor and amounts to inequitable conduct. There are cases which hold that this is enough for fraud before the Patent Office. *See,* e.g., Beckman Instruments, Inc. v. Chemtronics, Inc., 428 F.2d 555 (5th Cir.), cert. denied 400 U.S. 956, 91 S.Ct. 353, 27 L.Ed.2d 264 (1970). *See,* generally, M. Ram, Patent Fraud: A New Defense, 54 J.Pat.Off.Soc'y. 363 (1972); S. Cochran, Historical Review of Fraud in Patent Procurement: The Standards and Procedures for Doing Business Before the Patent Office, 52 J.Pat.Off.

Soc'y. 71 (1970). There is some question about whether the *Beckman* standard or a more traditional standard of fraud should be applied, but assuming that defendant's standard is the correct one, the Court is not in a position to make findings on this issue. It is clear that my finding of invalidity is so intimately connected with what plaintiff disclosed or should have disclosed to the Patent Office that the issue would require re-examination if further proceedings establish that this Court has erred on the question of validity. Accordingly, since the goal of judicial economy would not be served, I decline to make findings on this matter.

*Antitrust Counterclaim*

The substance of defendant's counterclaim is that plaintiff's enforcement of a patent obtained by fraud and retained through fraudulent activities during the Interference proceedings is a violation of § 2 of the Sherman Act (15 U.S.C. § 2). While there was some question as to the nature of the fraud required for invalidity, here there must be an intentional fraud. Walker Process Equipment, Inc. v. Food Machinery & Chemical Corp., 382 U.S. 172, 176, 86 S. Ct. 347, 15 L.Ed.2d 247 (1965). Although I have found that plaintiff should have filed the cross-license during the Interference under 35 U.S.C. § 135(c),[17] there was no showing of willful and intentional failure to file. Further, the evidence adduced with respect to non-disclosure during the initial prosecution does not establish the kind of willful conduct necessary to sustain the antitrust allegations. Since I find that there was no intentional fraud, it is unnecessary to determine whether the antitrust elements required by *Walker, supra,* were proved by defendant.

In view of the foregoing, judgment is to be entered for the defendant on the infringement claim and for the plaintiff on the antitrust counterclaim.

Appendix A to follow

17. Moreover, the Court doubts whether the Interference decided only as to claim 6 is relevant to the antitrust claim in this suit.

April 3, 1962 A. ROSENFELD ET AL 3,028,538

REGULATED OUTPUT VOLTAGE POWER SUPPLY

Filed Aug. 4, 1958

INVENTORS

Aaron Rosenfeld
BY Kenneth Kupferberg

ATTORNEY

# United States Patent Office

3,028,538
Patented Apr. 3, 1962

3,028,538
## REGULATED OUTPUT VOLTAGE POWER SUPPLY
Aaron Rosenfeld, Jackson Heights, and Kenneth Kupferberg, Flushing, N.Y., assignors to Forbro Design Inc., New York, N.Y., a corporation of New York
Filed Aug. 4, 1958, Ser. No. 752,694
7 Claims. (Cl. 323—22)

This invention relates to transistorized power supplies having a regulated output voltage. More particularly, the invention is directed to a standardized reference unit and a control amplifier assembled as a plug-in unit for connection to an unregulated supply and providing an output voltage always equal to the value set on a voltage control, a feature of the unit being the adjustability of the output voltage to zero volts.

Regulated power supplies are closed loop feed-back systems in which, if the output voltage, of a constant voltage supply, varies from a pre-set value, a sensing system provides a corrective voltage to the supply in a direction to restore the output voltage to such pre-set value. Generally, such power supplies are designed for operation with a particular source of unregulated voltage. It would be desirable if a single regulated power supply could be used with a diversity of sources of unregulated voltage.

In accordance with the present invention, this is made possible by connecting the voltage reference, the control amplifier, the voltage control, and the load into a bridge type reference network. With this arrangement all of the control circuitry can be permanently connected to the negative output terminal of the unregulated supply, and is independent of the voltage of the latter except for the connection of the voltage control to the positive output terminal of the unregulated supply. The entire arrangement may be built as a plug-in assembly which, after testing, may be plugged into the unregulated supply.

For an understanding of the invention principles, reference is made to the following description of a typical embodiment thereof as illustrated in the accompanying drawing. In the drawing, the single figure is a schematic wiring diagram illustrating a constant voltage power supply embodying the invention.

Referring to the drawing, a source of unregulated voltage is illustrated, by way of example, as comprising a battery 10 having a positive terminal 11 and a negative terminal 12. Negative terminal 12 is connected to collector 13 of a pass transistor 15, having an emitter 14 connected to a negative terminal 17 and a base 16 connected to a terminal 18. Terminals 17, 18 and 19 may be receptacles for receiving a jack or the prongs of a plug.

In accordance with the invention, a reference network 20 is arranged with a balanced control amplifier 25 of a constant voltage power supply connected across its junction points 21, 22. Junction point 21 constitutes the negative output terminal of the regulated power supply, and a load 26 is connected between junction point 21 and junction point 24, constituting the positive terminal of the regulated voltage power supply. Junction point 24 is connected to the positive terminal 11 of unregulated voltage supply 10.

A voltage reference 27 is connected between junction points 21, 23 of network 20, and a resistance 28 is connected between junction points 22, 23. Voltage control 30 is connected between junction points 22 and 24. A lead 29 connects terminal 18 to amplifier 25, and a lead 32 connects junction point 21 to terminal 17.

The elements 25, 27, and 28 may constitute a regulated power supply control assembly of the type shown and described in our copending application Serial No. 752,509, filed August 1, 1958. In the present case, elements 25, 27, and 28 constitute a plug-in assembly including a transistorized reference and amplifier.

The reference network operates as follows: once control resistance 30 has been adjusted to preset the desired fixed output voltage, the only variable in the network is the potential drop between junctions 21 and 24. The parameters of the network are such that, with the load voltage between points 21 and 24 at such desired output value, the network is in balance and points 21 and 22 have the same relative potential. There is thus no voltage drop in either direction across balanced control amplifier 25.

Should the load voltage vary from the desired value in either direction, there will be a resulting difference in relative potential between points 21 and 22, the relative polarity of such potential difference being dependent upon the direction in which the load voltage varies from the preset value. This potential difference applied across the balance control amplifier 25 conditions the amplifier to adjust the bias of transistor 15 in a direction such as to cause the transistor to vary its output in a direction to restore the load voltage to the present value.

Considered as a bridge, and if the fixed reference voltage 27 is designated as $V_1$, the fixed resistance 28 as $R_1$, the adjustable resistance 30 as $R_2$, and the load voltage 26 as $V_2$, then

$$V_1:V_2=R_1:R_2$$

or

$$V_2=V_1 \cdot R_2/R_1$$

If $V_2$, the load voltage varies, then the bridge becomes unbalanced and there will be a change in the drops across $R_1$ and $R_2$, and points 21 and 22 are no longer at the same potential. Hence, amplifier 25 has a potential thereacross and operates to correctively adjust the bias of transistor 15 to re-balance the bridge.

With the plug-in assembly constituting a reference network as illustrated, the output voltage across points 21, 24 always adjusts itself to a value determined by the voltage drop across voltage control 30 connected between points 22 and 24. This control voltage is determined simply by the setting of resistance 30, as this resistance is, in effect, set into a constant current voltage divider. More specifically, if the load voltage across 26 varies, amplifier 25 becomes unbalanced, resulting in introducing a corrective bias into transistor 15. The amplifier produces an output signal that re-adjusts the bias of pass transistor 15 in a direction to change the voltage across 26 to equal the desired output voltage to re-balance the network.

While a specific embodiment of the invention has been shown and described in detail to illustrate the application of the invention principles, it will be understood that the invention may be embodied otherwise without departing from such principles.

What is claimed is:
1. A regulated output voltage power supply comprising, in combination, a source of unregulated potential; a reference network including plural branches connected between first and second junction points; a pass transistor connected between one terminal of said source and said first junction point; a first load terminal connected to said first junction point; a balancing control amplifier having its input constituting one of said branches and having its output connected in bias controlling relation to said transistor; potential source means and resistor means connected in series in another of said branches and effective, upon unbalancing of the network, to provide a voltage drop between said junction points; resistance means connected between said second junction point and a third junction point connected to the other terminal of said source of unregulated potential and to the other load terminal; one of said means being adjustable to preset a

fixed desired value of output voltage; said network, when the source of potential is at a preset value and the potential between said load terminals is at such fixed desired value of output voltage, being balanced to the extent that said first and second junction points are at the same relative potentials; said network, when the output voltage varies from its preset value due to variation in either the source potential or the load, becoming unbalanced so that there is an operationally effective potential difference, between said first and second junction points, of a relative polarity depending upon the direction of such variation from the respective preset value; said potential difference conditioning said control amplifier to vary the bias of said transistor in an output voltage correcting direction.

2. A regulated output voltage power supply comprising, in combination, a source of unregulated potential; a reference network including plural branches connected between first and second junction points; a pass transistor connected between one terminal of said source and said first junction point; a first load terminal connected to said first junction point; a balancing control amplifier having its input constituting one of said branches and having its output connected in bias controlling relation to said transistor; means in another of said branches effective, upon unbalancing of the network, to provide a voltage drop between said junction points, an adjustable control resistance connected between said second junction point and a third junction point connected to the other terminal of said source and to the other load terminal; said control resistance being adjustable to preset a fixed desired value of output voltage; said network, when the source potential is at a preset value and the potential between said load terminals is at such fixed desired value of output voltage, being balanced to the extent that said first and second junction points are at the same relative potential; said network, when the output voltage varies from its preset value due to the variation in either the source potential or the load, becoming unbalanced so that there is an operationally effective potential difference, between said first and second junction points, of a relative polarity depending upon the direction of such variation from the respective preset value; said potential difference conditioning said control amplifier to vary the bias of said transistor in an output voltage correcting direction.

3. A regulated output voltage power supply comprising, in combination, a source of unregulated potential; a reference network including plural branches connected between first and second junction points: a pass transistor connected between one terminal of said source and said first junction point, a first load terminal connected to said first junction point; a balancing control amplifier having its input constituting one of said branches and having its output connected in bias controlling relation to said transistor; a source of reference potential means and resistor means connected in series in another of said branches and effective, upon unbalancing of the network, to provide a voltage drop between said junction points; resistance means connected between said second junction point and a third junction point connected to the other terminal of said source and to the other load terminal; one of said

means being adjustable to preset a fixed desired value of output voltage; said network, when the source potential is at a preset value and the potential between said load terminals is at such fixed desired value of output voltage, being balanced to the extent that said first and second junction points are at the same relative potential; said network, when the output voltage varies from its preset value, due to variations in either the source potential or the load becoming unbalanced so that there is an operationally effective potential difference, between said first and second junction points, of a relative polarity depending upon the direction of such variation from the respective preset value; said potential difference conditioning said control amplifier to vary the bias of said transistor in an output voltage correcting direction.

4. A regulated output voltage power supply as claimed in claim 3 in which said source of reference potential means is a source of relatively fixed reference potential, said resistor means is a fixed resistor, and said resistance means is adjustable to preset the fixed desired value of output voltage.

5. In a regulated power supply, the combination of, a source of voltage to be regulated, a pair of load terminals for connecting a load to be supplied with regulated voltage, control means connected between said source of voltage and at least one of said load terminals, a four terminal four arm bridge-like circuit including said load terminals as two of said four terminals and said load as one of said four arms, a source of reference voltage connected between one of said load terminals and a third terminal of said four terminals and comprising a second arm of said bridge-like circuit, a resistor connected between said third terminal and the fourth terminal of said bridge-like circuit, an adjustable resistor for determining the voltage to be supplied to said load connected between said fourth terminal and the said load terminal remote from the load terminal common to said reference voltage source and said load, a control amplifier connected between said terminal common to said reference voltage source and said load and said fourth terminal for developing a control voltage in accordance with departure of voltage across said load from voltage determined by said adjustable resistor and a circuit for applying said control voltage to said control means to cause said control means to restore said voltage across said load to said voltage determined by said adjustable resistor.

6. A regulated power supply as set forth in claim 5 in which said current control means is at least one power transistor.

7. A regulated output voltage power supply as claimed in claim 4 in which the collector of said transistor is connected to the negative terminal of said source and the emitter of said transistor is connected to said first junction point; the bias signal from said control amplifier being applied to the base of said transistor.

References Cited in the file of this patent

UNITED STATES PATENTS

2,751,549 Chase _____ June 19, 1956

## Disclaimer

3,028,538.—*Aaron Rosenfeld*, Jackson Heights, and *Kenneth Kupferberg*, Flushing, N.Y. REGULATED OUTPUT VOLTAGE POWER SUPPLY. Patent dated Apr. 3, 1962. Disclaimer filed Nov. 12, 1965, by the assignee, *Forbro Design Inc.*

Hereby enters this disclaimer to claim 5 of said patent.

[*Official Gazette March 29, 1966.*]

UNITED STATES PATENT OFFICE
**Certificate**

Patent No. 3,028,538 Patented April 3, 1962

Aaron Rosenfeld and Kenneth Kupferberg

Application having been made jointly by Aaron Rosenfeld and Kenneth Kupferberg, the inventors named in the patent above identified; and Forbro Design Inc., New York, N.Y., a corporation of New York, the assignee, for the issuance of a certificate under the provisions of Title 35, Section 256 of the United States Code, deleting the name of the said Aaron Rosenfeld from the patent as a joint inventor, and a showing and proof of facts satisfying the requirements of the said section having been submitted, it is this 14th day of June 1966, certified that the name of the said Aaron Rosenfeld is hereby deleted from the said patent as a joint inventor with the said Kenneth Kupferberg.

[SEAL]

EDWIN L. REYNOLDS,
*First Assistant Commissioner of Patents.*

## APPENDIX "B"

*Stipulations:*

21. Similarly, the power tube, or power transistor or, as we will call it, the series "pass element" can be on the negative side of the load as well as the positive side.

23. The patent in suit employs a "bridge-like circuit". In the electrical arts a "bridge" conveys the concept of a circuit like the drawing of the patent in suit, drawn as a square or diamond with a signal being derived from a connection between two diagonally opposite terminals. In the operation of a "bridge" when the bridge is in "balance" one pair of diagonally opposite terminals have the same voltage, no current would flow in either direction between these terminals if they were connected to each other, and no signal would be generated. However, if the bridge goes out of balance, a signal of one direction or the other would be generated between the pair of diagonally opposed terminals depending upon which way the bridge is out of balance. This provides a convenient way for developing a control signal for holding electrical circuits at a given

voltage or other value and was known and used in the art prior to the patent in suit for this purpose, (see e.g. Sorenson U. S. Patent No. 2,569,500).

27. The use of transistors instead of tubes in voltage regulator circuits was known in the art prior to the patent in suit as may be seen, for example, in the following:

S. Sherr 2,698,416 (12–28–54)
H. J. Woll 2,806,963 (7–17–57);

"Duality as a Guide in Transistor Circuit Designs"

by R. L. Wallace,
Jr. and G. Raisbeck

*The Bell System Journal,* April, 1951 pp. 381–417

28. One way to insert a PNP pass transistor into a regulator circuit is to have the base of the transistor connected to the control amplifier, and the collector of the pass transistor connected to the negative terminal of the unregulated source. Connecting a PNP power transistor into the circuit in this manner was well known prior to the patent in suit.

FIG. 2

INVENTOR.
CONRAD G. De BLASIO
BY
Harold Q. Gregory
ATTORNEY

June 24, 1958 C. G. DE BLASIO 2,840,777

DIRECT CURRENT POWER SOURCE

Filed March 21, 1955 3 Sheets-Sheet 3

FIG. 4

INVENTOR.

CONRAD G. DeBLASIO

BY

Harold C. Gregory

ATTORNEY